MID-STATE TRUST II *v.* Thelma JACKSON

CA 93-67                                      854 S.W.2d 734

Court of Appeals of Arkansas
Division II
Opinion delivered June 9, 1993

*Spencer, Spencer, Depper & Guthrie*, by: *James V. Spencer III*, for appellant.

*Witt Law Firm, P.C.*, by: *Neva B. Witt*, for appellee.

JAMES R. COOPER, Judge. The appellant in this chancery case petitioned for foreclosure. After a hearing, the chancellor found insufficient cause to accelerate the mortgage debt and denied foreclosure. From that decision, comes this appeal. We affirm.

In 1984, the appellee signed a promissory note in the amount of $42,098.40, payable in 216 monthly installments of $194.94 each, to Jim Walter Homes, Inc. The note provided that the holder could declare the entire debt due in the event of default in the payment of any installment for a period of thirty days or failure to promptly fulfill the obligations of the mortgage given to secure the note. The note was secured by a mortgage upon four lots located in Franklin County. In the mortgage, the appellee agreed to keep the property insured in an amount equal to the lesser of the actual cash value of the house on the land or the unpaid balance of the cash price of the house. In the sale contract, the appellee elected to obtain insurance covering the property through Best Insurers, Inc. The contract provided:

> In the event Buyer fails to furnish an acceptable policy of insurance, premiums prepaid, or in the event Buyer fails to keep in effect the required insurance cover-

age, Seller shall have the right, but not the obligation, to purchase such coverage for Buyer, and either add the premiums to the outstanding indebtedness or demand reimbursement from Buyer for those costs.

Jim Walter Homes assigned the note and mortgage to Mid-State Homes, Inc., which assigned them to Southeast Bank, N.A. as Trustee. Subsequently, Southeast Bank assigned the promissory note to Mid-State Trust II.

In July 1992, the appellant filed a complaint alleging that, because the appellee had failed to provide insurance coverage on the property, the appellant had obtained that coverage for the years 1985 through 1992 and had paid premiums in the amount of $1,797.90. The appellant asserted that the appellee was also in default on making the payments due under the note. The appellant sought judgment against the appellee for the balance of $15,982.98 due on the note, the amount paid for insurance premiums, attorney's fees, and costs. The appellant also sought foreclosure of the property securing the note.

At trial, Russ Racop, an employee of Jim Walter Homes, testified that he had been responsible for the appellee's account for the past three years. He testified that the appellee's account was delinquent in installment payments for the months of May, June, July, August, and September 1992. He also stated that the appellee was delinquent in paying the insurance premiums from 1985 through 1992 in the amount of $1,797.90. His records reflected that the last payment was received on June 15, 1992, and was credited toward her April 5, 1992, installment; the appellee's account was placed in foreclosure around June 25, 1992. Mr. Racop testified that he had, over a period of time, spoken with the appellee by telephone and in person at her house about her late payments. He stated: "There have been occasions that I've come by the home, or my supervisor would have come into town and gone by and left messages for her to return the calls. Mrs. Jackson is usually pretty good about calling back, and it's the same story each time."

On cross-examination, Mr. Racop admitted that, on June 1, 1992, when he recommended that the account be foreclosed, the appellee was delinquent in making one monthly installment. He

also admitted that he did not inform the appellee that she had been noting on her checks that each payment was for a month later than the month to which the appellant applied each one. He stated that the appellant had considered the appellee to be behind in payments ever since the appellee missed the August 1989 payment. He admitted, however, that he had been provided with a copy of a check for that payment. He stated that he did not apprise the appellee of the confusion in regard to the checks because "she knew the payments were behind, because I'd been contacting her every month." Mr. Racop stated that the appellant had returned a personal check dated July 1, 1992, to the appellee and admitted that the appellant had refused to accept the appellee's checks after the account was placed in foreclosure.

The appellee testified that she and her husband, who died in 1988, had first purchased the property in 1978. She stated that, in 1984, the house had been in foreclosure and Jim Walter Homes had sold it back to her for more than she had originally paid for it. She also stated that Jim Walter Homes had required the note and mortgage to reflect her, but not her husband, as owner, even though she was married to him at that time. She stated that, since 1978, she had paid over $34,000.00 for the house, and her monthly income is $427.00 in social security benefits. She also testified about Mr. Racop's practice of accepting late payments from her:

> A. For over two and a half (2 1/2) years Mr. Racop has called me every month on about the 14th, and then from the 14th through the 17th, and he kept telling me that I was two (2) payments behind. I kept saying, "I am not two (2) payments behind, I'm late on this payment, but I will pay the late charges." See the payment is due on the 5th, but I don't have to pay late charges until after the 15th. And he said, "But you are still behind that '89 September payment." I went through all my canceled checks, and I found that the September of '89, and Mary made copies for me, and I sent them to him.
>
> Q. Did they ever tell you that they had applied that September payment from that copy that you sent of that check, did they ever tell you that they had applied it on a previous month?

A. No, when I . . . sent my next payment . . . the June payment that Mr. Racop was talking about, when I sent it to him, I think it was in June I mailed it to him in Fort Smith, he called me to tell me that he had got it. I said, "Did you get — also get the copy of that September of '89 check?" He said, "Yes, but you could have wrote that September on there any time." And I had been writing it on there, the month, and most of the time my account number.

Q. On your memo?

A. Since '78 I have been writing it on that memo.

Q. Okay. And have you been through your canceled checks?

A. Yes.

Q. Okay. And are you behind on that September payment?

A. No.

Q. Did anyone ever call to your attention or tell you that the labels on your checks, where you are writing on the memo, was incorrect?

A. No.

The appellee testified that she made the May 1992 payment around June 1 and her next payment was returned to her by the appellant. She stated that the last payment she made was not delinquent and that she would have been current on her account if it had been accepted.

With regard to the insurance premiums, she stated that the appellant had her "so mixed up that I don't know where I'm at . . . ." She said that she had occasionally received bills for the insurance and had paid some of them:

Q. Have you been receiving these bills for the insurance?

A. Occasionally.

Q. Okay. And when you would get them, do you pay them?

A. I have paid some. Uh, now, they told me — I have called, . . . it used to be Terry someone, that I would call and tell her that I couldn't make all the payment, and she'd say,

"Well, why don't you just on your house payment add so much to it," you know. Well, that didn't work too well. So then I would send like a Hundred and Fifty Dollars ($150.00) or something. I have canceled checks, but I don't have them with me.

Q. Okay. And you've been paying that directly?

A. Yes, to Best Insurers. They have — I have a little card that goes with every payment.

Q. Did anyone ever indicate to you that that was not acceptable to you to do it that way?

A. No, they — they said it was fine if I could pay so much — just so much at a time.

Q. And have you been doing that?

A. I haven't for the past year.

The appellee stated that she had not been informed by the appellant that, if she did not pay the insurance, the appellant would foreclose on her property.

On October 6, 1992, the chancellor awarded judgment to the appellant for the arrearages in the insurance payments in the sum of $1,797.90, plus costs and attorney's fees. The chancellor found that the appellee's proof that she was current in her payments of principal and interest was stronger than the appellant's proof on that issue. He also found that all payments were refused by the appellant after June 1992 and that the appellee's failure to pay some of the insurance premiums was not sufficient to accelerate the balance. He found that the appellee had paid approximately $34,000.00 since 1978, and denied acceleration of the debt and foreclosure because it would be "totally inequitable" based upon the facts. In the judgment, the chancellor ordered the appellee to immediately begin to pay her regular monthly payments and to immediately procure and keep current a valid insurance policy in an amount sufficient to satisfy the appellant. He further stated that failure of the appellee to comply with that order would constitute facts sufficient to allow acceleration of the debt and foreclosure of the mortgage.

The appellant argues on appeal that the chancellor

erred in failing to grant foreclosure. The appellant first argues that the chancellor erred in refusing to find that the appellee was delinquent in her monthly installment payments. We cannot say that the chancellor erred in finding that the appellee's proof upon this issue was stronger than the proof offered by the appellant. The appellee testified at length on this subject, and her testimony adequately supports the chancellor's finding in this regard. On our review of chancery cases, we will not set aside a chancellor's findings of fact unless they are clearly erroneous or clearly against the preponderance of the evidence. *Bright* v. *Gass*, 38 Ark. App. 71, 78, 831 S.W.2d 149, 153-54 (1992).

The appellant also argues that the appellee's delinquency in paying the insurance premiums warranted foreclosure. We disagree. It is true that the appellant could accelerate the entire debt due and seek foreclosure upon the appellee's default in the payment of the insurance premiums. *See Mooney* v. *Tyler*, 68 Ark. 314, 315, 57 S.W. 1105 (1900). Nevertheless, principles of justice permit a court of equity to protect the debtor against an inequitable acceleration of the maturity of a debt. *Crone* v. *Johnson*, 240 Ark. 1029, 1031, 403 S.W.2d 738, 740 (1966). *See also Harrell* v. *Perkins*, 216 Ark. 579, 581-82, 226 S.W.2d 803, 804-05 (1950).

> While the consequences of the court's grant of equitable relief cannot affect its power, they nevertheless have an important bearing on the exercise of the judicial discretion which must guide a court of equity in determining the question whether it should grant or withhold a remedy which is within its power to give. In other words, the consequences of granting relief should be balanced against the need for it.

27 Am. Jur. 2d *Equity* § 107 (1966). In *State* v. *Cate*, 236 Ark. 836, 845, 371 S.W.2d 541, 546 (1963), the supreme court acknowledged that a court of equity may withhold the complete relief to which a plaintiff would otherwise be entitled if the defendant is willing to give in its stead such substituted relief as, under the circumstances, satisfies the requirements of equity and good conscience. In *United States* v. *Forrester*, 118 F.Supp. 401, 412 (W.D. Ark. 1954), the district court acknowledged that equity may relieve against acceleration of a debt where strict

enforcement of acceleration would impose an unconscionable hardship on the mortgagor and give the mortgagee an unconscionable advantage.

■ We hold that the remedy ordered by the chancellor in this case was appropriate under the facts shown at trial. A court of equity may fashion any reasonable remedy justified by the proof. *Smith* v. *Eastgate Properties, Inc.*, 312 Ark. 355, 361, 849 S.W.2d 504, 508 (1993); *Cox* v. *Cox*, 17 Ark. App. 93, 95-A, 704 S.W.2d 171, 173 (1986). In *Rawhide Farms, Inc.* v. *Darby*, 267 Ark. 776, 589 S.W.2d 210 (Ark. App. 1979), we approved relief similar to that ordered in this case. In *Rawhide Farms*, the mortgagee had tried to work with the mortgagors by extending and taking partial payments on the overdue amounts before filing for foreclosure, and it was undisputed that all of the amounts due had not been paid. We noted that the acceptance of the late payments was not a waiver of the mortgagee's right to accelerate with regard to subsequent installments. We stated, however:

> Under these circumstances, where the appellants are at fault for not paying and the appellees for giving them some reason to believe acceleration would not occur, we hold the appellants should, upon remand, be given a reasonable time to make the overdue payments. If the entire amount owed by the appellants to Mr. Darby's estate, that is, the entire amount of the smaller note plus interest and the payments due on the larger note in accordance with its terms plus interest, is not paid at the date to be prescribed by the chancellor, the foreclosure may proceed. This was the approach taken by the Arkansas Supreme Court in *Crone* v. *Johnson*, 240 Ark. 1029, 403 S.W.2d 738 (1966), albeit far lesser sums were involved, and we think it fair. We note that, although we have said the chancellor will give the appellants a reasonable time to make their payments current, in no event will the appellees be precluded from acceleration and foreclosure on October 31, 1980, if the amount due then, including the payment which falls due on that date, has not been paid.

*Id.* at 783, 589 S.W.2d at 214.

■ Here, the evidence was undisputed that the appellant had a long history of accepting late payments from the appellee and that its representatives had been in frequent contact with the appellee about her installment and insurance payments. Given the fact that the appellee had paid over $34,000.00 for the property since 1978, and the relatively small amount of the unpaid insurance premiums compared to the amount the appellee had paid on the note since 1984, we find no error in the chancellor's refusal to grant foreclosure in this case.

Affirmed.

JENNINGS, C.J., and ROBBINS, J., agree.